## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SHANON R. RECTOR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 13-CV-253-JED-PJC |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Claimant, Shanon R. Rector, ("Rector"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Rector's applications for disability insurance benefits and for supplemental security income benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq*. Rector appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that she was not disabled. This case has been referred to the undersigned. For the reasons discussed below, the undersigned recommends that the Commissioner's decision be **AFFIRMED.**

### Claimant's Background

At the time of the hearing before the ALJ on August 17, 2011, Rector was 34 years old (R. 30, 35). She was divorced with two children, ages 17 and 12 years old. (R. 36). Rector had a GED and had completed some training classes, and was able to read, write, and use numbers. *Id.* She had received limited job training on how to care for the disabled at Oklahoma State

University.  (R. 36-37).

Rector had last worked in 2006 as a babysitter.  (R. 37).  Prior to that, Rector had worked as a Habilitation Training Specialist.  (R. 38).  She stated that she tried looking for jobs but was either not able to start or could not get hired.  *Id.*

Rector explained that she was prevented from working a full-time job due to her various medical issues, primarily problems with her back, hands, eyes, allergies, asthma, and knees.  (R. 38-39).  Regarding her back, Rector stated that she had degenerative disc disease, for which she had twice received a steroid injection.  (R. 39).  The injections reportedly limited her activities for a week each time, and during the first 72 hours after each injection, she was instructed to stay in bed.  *Id.*  The first time she received the injection, Rector felt better after 72 hours and was able to move around, but after the second one she was "in a lot of pain" and it took longer before she could move around without assistance.  (R. 40).  According to Rector, the lower lumbar region of her back had been a problem ever since she was hurt on the job in 1997.  (R. 39).

In describing the pain in her back, Rector characterized it as "a real stiff hard pain."  (R. 40).  She explained that if she moved too much, the pain felt like a tear.  *Id.*  When this occurred, Rector needed to take anti-inflammatories and could not perform very many activities until the pain eased.  *Id.*  As long as she did not do anything to agitate it, the intense pain would decrease within a few days back to a feeling of stiffness.  (R. 40-41).

Rector also explained that her most comfortable position was lying down.  (R. 41).  She claimed to spend 85-95% of her day lying down in order to relieve the pressure on her back.  *Id.*  Rector added that standing increased her pain, and that she could only stand for three to five minutes without needing to bend over or lean on something.  (R. 42-43).  Rector elaborated that

2

her back pain extended from her low back through her entire back, sometimes moving into the back of her ribs.  (R. 43).  Sometimes she felt like her lungs were being compressed, and other times her legs would go totally numb and begin to tingle.  *Id.*  Rector added that if she did not stop herself and take some pressure off her legs, her ankles would swell up as if they were sprained, which would then begin to affect her knees.  *Id.*  Usually her left knee was affected worse than her right knee.  *Id.*  Rector also reported a grinding sensation in her knees.  *Id.*

Rector claimed that she could only sit for 15-30 minutes before becoming uncomfortable and wishing to lie down.  (R. 44).  Walking was not as difficult for her back as standing; however, walking caused Rector's knees to buckle and prompted sharp pains and soreness in her knees.  *Id.*  As a result, Rector would experience various problems with stumbling and balancing when trying to walk.  (R. 44-45).  Rector's knee would "catch" a couple of times a day, depending on her activity level.  (R. 45).  Rector would then have to rest her knee for a few seconds or minutes until it returned to normal.  (R. 46).

Rector's movements were reportedly restricted in other ways as well.  *Id.*  She could squat, but had to be careful when coming up due to her knees.  *Id.*  She stated she could not kneel, as this would place too much pressure on her knees.  *Id.*  She could not bend over to touch her toes but could bend over to touch her knees, although that movement would strain her back (R. 46-47).  Rector could climb a flight of stairs slowly, but only if she held on to something, otherwise she would risk losing her balance.  (R. 47).

With regard to her weight, which was 205 pounds at the time of the hearing, Rector asserted that this was not her normal weight and that she was unusually overweight.  (R. 47-48).  She explained that she had gained weight because she could not be as active due to her back and

knee problems.  (R. 48).  Rector noted that her mobility was hampered because if she turned or twisted wrong, her back would be out for a few days and she would be stuck in bed.  *Id.*

In regards to her hand problems, Rector stated that she had carpal tunnel syndrome in both hands, which had previously required a surgery on her left hand.  *Id.*  If Rector used her hands too much or gripped too strongly, she reported her hands would go completely numb and lose their strength.  *Id.*  If Rector attempted to write, her hands would become sore and cramp up. (R. 49).  She could do the dishes, but only "every now and then" due to the discomfort caused by standing.  *Id.*  She often needed assistance in doing dishes because she lacked the strength to lift heavy pans.  *Id.*  Rector tried not to lift anything heavier than a gallon of milk.  *Id.*  Rector added that her son and daughter did the majority of the grocery shopping.  (R. 50).  She had once put her back out trying to put the groceries away, so her son also did that for her.  *Id.*

In discussing her eye problems, Rector stated that she had very sensitive eyes due to three corneal abrasions, allergies, and mild dysplasia.  *Id.*  Her eyes were very sensitive to light and would reportedly get abrasions quite easily.  *Id.*  Rector noted that she had to take special eye drops.  *Id.*  Dust and changing seasons were particularly problematic for Rector's eye allergies. (R. 50-51).  When asked whether her asthma was also allergy-related, Rector replied that she had bronchial asthma and seasonal asthma.  (R. 51).  She added that her asthma was exacerbated by rain, heat, dust, humidity, or anxiety attacks.  *Id.*

In order to stave off her asthma attacks, Rector would do breathing treatments with a nebulizer approximately three times per month.  *Id.*  She also had an inhaler.  *Id.*  Rector claimed that if something made her start coughing, or if she had an anxiety attack, her breathing would increase and she would have to fight off an asthma attack.  *Id.*  Her longest asthma attack had

lasted 15 minutes.  (R. 52).  Rector added that the weather not only affected her asthma, but also that cold weather also increased problems with her arthritis, causing stiffness, pain, and decreased mobility.  *Id.*

Rector also discussed her anxiety issues.  (R. 52-53).  She stated that she had post-traumatic stress disorder ("PTSD"), which caused her to have anxiety attacks.  (R. 52).  Rector explained that her PTSD was like "walking on eggshells."  (R. 53).  She was affected by loud noises such as shouting, children crying, doors slamming, and brakes squealing.  *Id.*  Rector was a light sleeper who experienced frequent nightmares.  *Id.*  She did not sleep well because of her back pain and arthritis, which caused her to toss and turn.  *Id*.  When she could sleep, Rector would be awoken by nightmares and would have trouble going back to sleep.  *Id.*  She claimed she slept four hours most nights and woke up still feeling tired.  *Id.*  Rector would often nap during the day.  (R. 54).  Rector had received mental health treatment for a while, but had ceased the treatments by the time of the hearing because her therapist was no longer able to provide in-home treatment.  *Id.*

Rector stated that she could drive short distances, but never drove alone.  *Id.*  She preferred having someone else drive, but if that was not an option, Rector would still have someone else ride in the car with her.  *Id.*  Rector added that after a 30-minute ride, she would experience soreness and difficulty walking.  (R. 55).  Rector also claimed that her driving ability was affected by her memory loss due to a previous concussion.  *Id.*  Rector added that she could not drive when taking her pain medication because the medication made her less attentive and slowed down her mental processes.  (R. 55-56).

Rector also stated that her memory difficulties caused her to experience occasional

trouble in speaking, as well as in remembering things like numbers, dates and appointments.  *Id.*
Her concentration also suffered.  *Id.*  She would watch television, but would flip channels rather
than sitting and focusing on one thing.  *Id.*

Rector expressed general frustration about not being able to be as active as she once was.
(R. 57).  She recounted an incident a few weeks prior when she was just sitting on the floor and
her back gave out, and as a result, she had to go to the emergency room and was unable to walk
for several days.  *Id.*  Rector also explained that her conditions had affected her interactions with
people.  *Id.*  She stated that she preferred not to be around other people, felt less intelligent than
she used to be, and could not do everything she used to be able to do.  *Id.*

### Medical Evidence of Record

In 2009, Rector sought treatment at CREOKS Mental Health for her psychological
issues.  (R. 269-89).  In an assessment dated April 23, 2009, Rector reported experiencing
depression and anxiety.  (R. 279).  She stated that she isolated herself from family and friends
and sometimes had a difficult time parenting due to her mental issues.  (R. 279-80).  Rector
explained that she experienced episodes of extreme anxiety daily lasting 4-5 hours, was
depressed daily for 5-6 hours, and was easily angered.  (R. 284).  She complained that she
occasionally saw shadows and people, heard her name being called two or three times a week,
and had a poor memory.  *Id.*

Rector reported that she had been sexually abused from the age of one year-old to twelve
years-old and that she was raped at age 22.  (R. 280).  Rector also stated that her second husband
physically and emotionally abused her.  *Id.*  Additionally, she stated she had been kidnapped by
an ex-boyfriend the year before.  (R. 282, 284).  Rector reported that she was unable to work due

6

to depression and anxiety.  *Id.*  Rector was diagnosed with PTSD and Major Depressive

Disorder.  (R. 287).  A Client Assessment Record noted several problem areas, including anger,

anxiety, coping skills, depression, memory, and delusions/hallucinations.  (R. 271-72).

On September 16, 2009, Rector reported to the emergency room at the Oklahoma State

University ("OSU") Medical Center complaining of chest pain on her right side.  (R. 263).

Rector rated the pain as an eight on a scale of one to ten, and stated that the pain occurred

intermittently and was worst when she twisted her trunk or moved her arms.  *Id.*  An

electrocardiogram revealed a normal sinus rhythm with a ventricular rate of 69 beats per minute.

(R. 264).  There were no acute abnormalities.  *Id.*  The patient had a normal axis, and a chest x-

ray was negative for any acute inthrathoracic pathology.  *Id.*  Based on her reported history of

fibromyalgia, Rector was diagnosed with muskuloskeletal pain.  *Id.*  Rector was prescribed

Ultram, Prednisone, and Flexeril.[1]  *Id.*

On September 28, 2009, Rector presented to the Family Medicine Clinic in Sand Springs

complaining of a cough, chest congestion and sinus drainage.  (R. 295).  The treating physician

noted bronchitis, asthma, anxiety/depression, PTSD, and possible fibromyalgia.  *Id.*  Rector's

prescription for Lyrica[2] was refilled and she was also prescribed an antibiotic.  *Id.*  A week and a

half later, on October 7, 2009, Rector returned to the Clinic, complaining of back pain.  (R. 294).

Rector was prescribed Naproxen[3] and Flexeril.  *Id.*  A November 23, 2009 record from the Clinic

---

[1] Ultram is a pain medication; Prednisone is a steroid; Flexeril, also known as Cyclobenzaprine, is a muscle relaxer.  *www.pdr.net*.

[2] Lyrica is a pain medication sometimes used to treat back pain and fibromyalgia. *www.pdr.net.*

[3] Naproxen is a pain medication.  *www.pdr.net.*

7

indicated that Rector's physician could not conclusively diagnose her with fibromyalgia, because he could not perform that type of testing.  (R. 291).

On December 31, 2009, Rector visited the emergency room at Hillcrest Medical Center after falling on ice and hitting her head.  (R. 299-311).  Testing revealed that Rector had no displacement or subluxation of the spine and that her intervertebral disc space, soft tissue, and cervical spine curvature were all normal.  (R. 302, 304).  A CT scan found no midline shift or mass effect, normal ventricles, a lack of hemorrhage or edema, and no subdural fluid collection.  (R. 305, 310).  Rector was diagnosed with cervical strain and a minor head injury.  (R. 310).  She was prescribed pain medication and instructed to follow up with her primary care provider.  (R. 309-10).

On January 4, 2010, Rector presented to the Family Medicine Clinic for a follow-up appointment regarding her head injury.  (R. 353).  She indicated that she was having trouble with vision and dizziness.  *Id.*  Rector's physician diagnosed her with head trauma and anxiety/depression and prescribed Naprosyn.[4]  *Id.*

Several months later, on July 9, 2010, Rector again visited the Clinic, this time complaining that she could not sleep because her legs hurt all night.  (R. 359).  Her treating physician diagnosed her with anxiety/depression, leg pain, knee pain, and noted a history of anemia.  *Id.*  Rector was prescribed Neurontin[5] and was referred to The Orthopaedic Center for further evaluation.  *Id.*

On July 21, 2010, Rector presented to The Orthopaedic Center, complaining that pain

---

[4] Naprosyn is a pain medication.  *www.pdr.net.*

[5] Neurontin treats seizures and nerve pain.  *www.pdr.net*

and problems had existed in both of her knees for years and had recently worsened.  (R. 360).

Rector explained that the pain in both knees included popping, catching, locking, and giving

way.  *Id.*  Examination of the right knee revealed normal alignment with an antalgic gait.  (R.

361).  The tibial tubercle was in line with the lateral third of the patella.  *Id.*  The physician noted

normal mobility and tracking without crepitation of the patella with range of motion.  *Id.*  Quad

tone and mass were good, and Rector could raise her leg straight up.  *Id.*  There was no quad

defect, quad tenderness, patella defect, or tenderness of the patella tendon.  *Id.*  Rector also did

not exhibit iliotibial band tenderness or tenderness of the pes bursa.  *Id.*

Rector's range of motion on the right knee also revealed 0 degrees of extension without

pain and 110 degrees of flexion without pain.  *Id.*  There was no instability to valgus stress or

varus stress.  *Id.*  Rector exhibited good endpoint and negative Lachman, and a negative anterior

and posterior drawer sign.  *Id.*  There was no posterior lateral corner laxity or lateral joint line

tenderness, but the physician did note medial joint line tenderness.  *Id.*  Rector displayed pain

with maximal flexion and twisting of the tibia on the hyperflexed knee.  *Id.*  The opposite knee

showed similar findings.  *Id.*  The physician's overall impression was that Rector was probably

suffering from bilateral medial meniscus tears and an MRI for Rector's knees was scheduled.  *Id.*

The MRI was performed on Rector's knees on August 5, 2010.  (R. 362).  It revealed no

meniscal tear.  *Id.*  The anterior cruciate and posterior cruciate ligaments were intact.  *Id.*  The

medial collateral ligament and lateral collateral ligament complexes were unremarkable.  *Id.*

The examining physician noted that other than mild chondromalacia[6] of the medial patellar facet,

---

[6] Chondromalacia of the patella is defined as pain and grating in the anterior part of the
knee, particularly in flexion, with softening of the cartilage on the articular surface of the patella.
DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 344 (29th ed. 2000) (hereinafter, "Dorland's").

this was an unremarkable exam.  (R. 363).  A specialist at The Orthopaedic Center recommended to Rector's treating physician that Rector be prescribed Synvisc[7] injections.  (R. 365).  The specialist also recommended six weeks of physical therapy to strengthen the patellas, as well as anti-inflammatories.  *Id.*  Rector was also referred to the Osteoporosis Clinic due to her risk factors for osteoporosis.  (R. 366).

On August 23, 2010, Rector presented to the Family Medicine Clinic.  (R. 367).  Rector was still complaining of bilateral knee pain.  *Id.*  Rector's physician ordered bloodwork, which revealed that her Rheumatoid Factor was within the normal range.  (R. 368).

On January 5, 2011, Rector returned to the Clinic complaining of shortness of breath and tightness in her chest.  (R. 385).  Her physician noted that Rector's breath was wheezy.  *Id.* Rector was diagnosed with acute exacerbated asthma and anxiety/depression.  *Id.*  She was prescribed Albuterol and Atrovent, to be used in her nebulizer at home, as well as Medrol.[8]  *Id.*

On January 28, 2011, Rector presented to The Orthopaedic Center for a check-up on her bilateral knee chondromalacia patella.  (R. 395).  Rector had previously received a Synvisc injection to her bilateral knees on September 8, 2010.  *Id.*  She reported that the injection did well for the first few months, but that pain and discomfort had returned to her knees.  *Id.*  Rector was experiencing popping, grinding and instability due to her pain, and indicated an increase in discomfort with activities.  *Id.*  Rector was requesting another round of Synvisc.  *Id.*

---

[7] Synvisc is an injection administered to treat osteoarthritis knee pain that is inadequately responsive to pain pills.  *www.pdr.net.*

[8] Albuterol and Atrovent are inhalant medications used to treat breathing problems; Medrol is a steroid.  *www.pdr.net.*

10

Rector's examination revealed largely the same results as her previous examination on July 21, 2010.  (R. 395-96, 360-61).  However, Rector's quad tone and mass had decreased.  (R. 396).  Quad strength was 5/5.  *Id.*  Hamstring strength was 5/5 and there was a slight effusion.  *Id.*  This time, range of motion revealed 0 degrees of extension without pain to 115 degrees of flexion without pain.  *Id.*  When examined, the hip, ankle, spine, and pelvis as well as the neurological, vascular, dermal system and lymphatic systems were normal.  *Id.*

In the examining physician's assessment, Rector displayed bilateral knee chondromalacia patella.  *Id.*  Rector was instructed that Synvisc was to be administered every 6-12 months.  *Id.*  Because she was only four months out from the previous injection, Rector was not yet due for a repeat Synvisc injection.  *Id.*  In response to Rector's complaint of severe knee pain, the physician injected the left knee with a steroid injection instead.  (R. 396-97).  She was instructed to stay active on her bilateral lower extremities and was scheduled to return in three months for a check-up.  *Id.*

On February 22, 2011, Rector returned to The Orthopaedic Center for evaluation of her left leg.  (R. 393).  With regard to her leg, Rector complained of numbness, difficulty walking, and popping and swelling due to the steroid injection the previous month.  *Id.*  When questioned further, Rector admitted that she had felt fine for three weeks, but that three weeks after the injection, her leg went to sleep and she experienced back pain.  *Id.*  Her back had improved, but she was still experiencing numbness in her leg and knee.  *Id.*  When examined, Rector exhibited some generalized joint tenderness, but nothing specific.  *Id.*  She had 1+ effusion and a good range of motion.  *Id.*  Her pulses were 2+ and symmetrical.  *Id.*  Her sensory exam was intact on gross examination on both lower extremities.  *Id.*  Rector did demonstrate pain with range of

motion of her lumbar spine; although she could forward flex to 90 degrees, hyper-extension was a "bit irritable."  *Id.*  Rotation was limited most to the right and to the left.  *Id.*

Radiographs revealed some L4-L5, L5-S1 disc narrowing and mild-to-moderate degenerative arthritis of bilateral knees.  *Id.*  The physician noted Rector's history of two bulging disks, and opined that her recent back pain was primarily related to that and not to her injection at all.  *Id.*  The physician decided to proceed with reevaluation of Rector's lumbar spine and scheduled an MRI.  (R. 393-94).  The specialist at The Orthopaedic Center recommended that Rector call her physician for a refill of her prescriptions.  (R. 394).

On February 23, 2011, Rector returned to the Family Medicine Clinic, complaining of headaches and backache.  (R. 384).  She stated that she needed a refill on her anti-inflammatory medication to prevent itching due to nerves.  *Id.*  Rector also asserted that her ability to hear was impaired, and she claimed that this was due to her previous head injury.  *Id.*  She desired pain management.  *Id.*  Rector was diagnosed with headache and backache, and was prescribed Anaprox DS and Klonopin.[9]  *Id.*  Rector's treating physician referred her to The Orthopaedic Center for pain management for her low back pain secondary to her leg pain.  *Id.*

On February 25, 2011, Rector presented to The Orthopaedic Center to obtain treatment for her knee pain and low back pain.  (R. 389).  Rector reported that her pain had started several months ago and was accompanied by numbness in her left knee.  *Id.*  She stated that pain in her knee and back was interfering with long sitting, long standing, and long distance ambulation.  *Id.*

The physician noted Rector's history of chronic knee pain, patella chondromalacia,

---

[9] Anaprox DS is a pain medication; Klonopin treats seizures, panic disorder, and anxiety. *www.pdr.net.*

anxiety, and depression.  *Id.*  During her neuromuscular examination, Rector was alert and oriented.  *Id.*  Cranial nerves were grossly intact.  (389-92).  Calculation and memory were within the functional limit.  (R. 392).  A sensory exam revealed normal proprioception, light touch, and pain stimuli.  *Id.*  A motor examination revealed muscle strength grossly 5/5 on all extremities, with no focal motor deficit.  *Id.*  Muscle stretch reflexes were 2+ symmetric for biceps, triceps, patella, and Achilles reflexes.  *Id.*  There was no tremor or cogwheel sign.  *Id.*  A Spurling test was negative.  *Id.*  Rector reported having difficulty ambulating on her tiptoes and heels secondary to severe knee pain.  *Id.*

The physician's clinical impression was that Rector was suffering from low back pain secondary to possible lumbar disk bulge at L3-L4 and L4-L5, possible lumbar spondylosis,[10] and left lower extremity radicular pain.  *Id.*  Further, Rector was also suffering from knee pain secondary to chrondromalacia of the patella.  *Id.*  The physician prescribed Tramadol, scheduled an MRI of Rector's lumbar spine, and noted that Rector was consulting with an orthopaedic specialist for her chondromalacia.  *Id.*

An MRI on the same date found straightening of the normal lumbar lordosis,[11] and the record indicates this could have been due to muscle spasm.  (R. 391).  The scan indicated that the vertebral body alignment was otherwise unremarkable.  *Id.*  The intravertebral disk heights were preserved, but there was disk dessication[12] at L4-L5 and L5-S1.  *Id.*  Otherwise, disk hydration

---

[10]  Spondylosis is the dissolution of a vertebra.  DORLAND'S at 1684.

[11]  Lordosis is the defined as the anterior concavity in the curvature of the lumbar and cervical spine as viewed from the side.  DORLAND'S at 1027.

[12]  A desiccated disk is one that has dried up.  DORLAND'S at 483.

13

was preserved and the vertebral body heights were preserved. *Id.* There was no neuroforaminal narrowing appreciated at any level. (R. 390). There was a tiny central disk protrusion at L4-L5. *Id.* Otherwise, no significant disk protrusion was identified at any level. *Id.* There was no central canal stenosis. *Id.* Mild facet arthropathy involved the lower lumbar spine. *Id.* The bone marrow signal was normal. *Id.* The conus medullaris and cauda equina were within normal limits. *Id.* The physician's impression following the MRI was that Rector was experiencing disk dessication at L4-L5 and L5-S1 with a tiny central disk protrusion at L5-S1. *Id.* No significant disk protrusion or stenosis was appreciated at any level. *Id.*

On March 11, 2011, Rector returned to The Orthopaedic Center for a follow-up visit for her low back pain. (R. 388). She rated her pain as a 5. *Id.* An examination revealed largely the same findings as her visit on February 25, 2011. (R. 388, 389, 392). Rector was diagnosed with low back pain secondary to a lumbar disk bulge with protrusion at L4-L5 and L5-S1. *Id.* Rector was prescribed Lortab, and her prescription for Tramadol was discontinued. *Id.*

On April 8, 2011, Rector presented to The Orthopaedic Center for another follow-up appointment regarding her low back pain. (R. 386). On that day, she rated her pain as a 5, and stated that it radiated to both legs. *Id.* Rector also reported occasional swelling in her ankles. *Id.* Inspection of Rector's back revealed no rash, no redness, and no swelling. *Id.* Palpitation of the back revealed pain at the lumbar paraspinal and lumbar facet joint bilaterally. *Id.* The physician's clinical impression was that Rector was suffering from low back pain secondary to lumbar disk bulge L4-L5 and lumbar spondylosis. *Id.* Rector was given a lumbar epidural steroid injection. *Id.* The attending physician noted that Rector benefitted from the injection. *Id.* There were no side effects and Rector was able to ambulate without difficulty after the

14

procedure.  (R. 387).  Rector was prescribed Lortab following the injection.  *Id.*

On April 27, 2011, Rector presented to the Family Medicine Clinic with complaints of allergies, headache, sore throat, and pain in her back, ears and throat.  (R. 383).  She exhibited a nasal cough and nasal discharge, and her throat was red.  *Id.*  Her physician diagnosed her as suffering from acute sinusitis and the effects of tobacco abuse.  *Id.*  Rector was prescribed an antibiotic and pain medication and was recommended to cease smoking.  *Id.*

On July 13, 2011, Rector presented to the emergency room at OSU Medical Center complaining of chronic back pain.  (R. 400-03).  Rector stated that she had bent over the day before and felt something pull or rip on the left side of her back.  (R. 400).  The pain did not radiate.  *Id.*  Rector reported that she felt worse with movement and walking, but improved when she would lie down in certain positions.  *Id.*  Rector was out of Lortab and Tramadol, which she had been taking for her back pain.  *Id.*  When examined, Rector displayed some left-sided lumbar paraspinal muscular type tenderness.  (R. 401).  She had no midline tenderness to palpitation and no midline tenderness to percussion.  *Id.*  She had no crepitus, no step-off, and no deformity.  *Id.* She could ambulate without difficulty.  *Id.*  The physician's overall impression was acute exacerbation of chronic lumbar pain.  *Id.*  Rector was placed on Ultram and Orudis[13] and her chronic pain medication was refilled.  *Id.*  She was instructed to return if her symptoms worsened.  *Id.*

### Examinations and Reports by Agency Consultants

On November 30, 2008, Minor W. Gordon, Ph.D., conducted a psychological evaluation

---

[13] Ultram is a medication that treats chronic pain; Orudis (also known as Ketoprofen) treats osteoarthritis, rheumatoid arthritis, and pain.  *www.pdr.net.*

of Rector.  (R. 206-15).  During the evaluation, Rector referred to panic attacks she experienced in response to being kidnapped.  (R. 206).  The attacks occurred twice daily and lasted anywhere from 10 seconds to 10 minutes.  *Id.*  Rector stated that she had not received mental health care since she was treated for a suicide attempt in 1988, but records showed that she had also received treatment in 2007.  (R. 206, 210).  Rector claimed to have bipolar and explosive disorder, but when questioned about her symptoms of bipolar disorder, she responded that she did not believe that she was bipolar, and noted that her primary problems were physical, not psychological.  (R. 206, 210).

During the examination, Dr. Gordon noted that Rector's mood displayed anger and depression.  (R. 208).  Her social-adaptive behavior was assessed within normal limits.  *Id.*  Her immediate retention and recall was assessed as adequate.  *Id.*  Her short term and long term memory were also assessed as adequate.  *Id.*  Her thought process was of variable speed and latency, the rhythm was spontaneous, and the organization coherent.  *Id.*  Dr. Gordon opined that Rector could communicate comfortably in social circumstances, avoid common danger, maintain her own personal hygiene, and pass judgment in a work situation.  *Id.*  She denied suicidal thoughts, thoughts about people wanting to harm her, and delusions or hallucinations.  *Id.*  Rector admitted to having an occasional nightmare associated with demons.  *Id.*

On the Beck Anxiety Inventory, Rector earned a total score of 46, which was interpreted as an individual suffering from a severe level of anxiety.  (R. 209).  On the Beck Depression Inventory, Rector earned a total score of 23, which was interpreted as an individual suffering from a moderate to severe level of depression.  *Id.*  On the Minnesota Multiphasic Personality Inventory - II, Rector produced a "valid" profile, that of an individual inclined to be immature,

16

narcissistic, and self-indulgent.  *Id.*  Her profile was that of a passive-dependent individual who made excessive demands on others for attention and sympathy and was resentful of mild demands made on her.  *Id.*  Dr. Gordon opined that she likely had difficulty getting along with others and had suspicions of the people around her.  *Id.*

Dr. Gordon diagnosed Rector with situational anxiety and depression secondary to unmet dependency needs on Axis I[14] and dependent personality traits, spelling disorder, and arithmetic disorder on Axis II. (R. 210).  Dr. Gordon concluded that Rector had a strong tendency to depend on others to do things that she should be able to do for herself.  *Id*.  This tendency likely prompted her anxiety and depression.  *Id.*  Dr. Gordon opined that Rector's anxiety and depression were only situational and would most likely surface only when her need to depend on others was unmet.  *Id.*  Dr. Gordon noted that Rector could perform some type of routine repetitive task.  *Id.*  She could relate adequately with co-workers on a superficial basis for work purposes.  *Id.*  Dr. Gordon also concluded that Rector was able to manage benefit payments in her own interest.  (R. 211).

Agency consultant Beau C. Jennings, D.O., conducted a physical examination of Rector on December 17, 2008.  (R. 216).  During the examination, Rector was alert and cooperative.  *Id.*  Dr. Jennings noted that Rector was obese.  *Id.*  Regarding her lower extremities, Rector exhibited a normal gait, the ability to squat well, and she had full range of motion.  *Id.*  There was no pretibial edema and no stasis dermatitis.  *Id.*  Her pedal pulses and deep tendon reflexes were

---

[14] The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

good. *Id.* A straight leg raise test was negative. *Id.* Rector's calves were equal in circumference. *Id.* Rector was assessed with fibromyalgia (per her medical history) and bipolar disorder. *Id.*

The same day, testing was performed on Rector at Hillcrest Medical Center as part of her disability application process. (R. 245-62). Tests on Rector's hands and wrists revealed a lack of fracture, dislocation or instability, and showed that the soft tissues were free from swelling, laceration, or any foreign body. (R. 245-46, 250). No abnormality was identified with regard to the hands or wrists. *Id.* Similarly, testing on Rector's knees found no identifiable fracture, dislocation, arthritic change, or lytic or blastic lesion. (R. 248-49). Radiographs of the knees were normal. *Id.* With regard to Rector's spine, the testing found that the lumbar vertebral bodies and the intervertebral disc spaces were normal. (R. 249). Vertebral alignment was normal, and there was no evidence of fracture, dislocation, or bony destruction. *Id.* The apophyseal joints were normal. *Id.*

Dr. Jennings completed a medical source statement and concluded that Rector had the ability to sit or stand for eight hours at a time, and had the ability to walk for three hours at a time. (R. 228). Similarly, he assessed that Rector had the ability to spend eight hours on a given day either sitting, standing, or walking. *Id.* He indicated that Rector could lift up to 25 pounds continuously, 26-50 pounds frequently, and 51-100 pounds occasionally. *Id.* Dr. Jennings also noted that Rector's use of her feet and repetitive movements were not limited. (R. 229). Rector was also not limited in her ability to grasp objects with her hands. *Id.*

On February 27, 2010, agency consultant Corey R. Babb, D.O., also completed a physical examination of Rector. (R. 312). Rector reported being diagnosed with fibromyalgia

18

and stated that she was currently taking Lyrica, which helped with her pain.  *Id.*  She explained

that her pain was worse in the morning and became progressively better toward the evening.  *Id.*

Rector described the pain as "achy," but indicated that if someone touched her, it would become

"sharp."  *Id.*  She stated that pain radiated through her whole body, but lying down and taking

Lyrica improved her pain.  *Id.*  Rector indicated that weather change, constant activity, and being

touched worsened her pain.  *Id.*  She added that she could bathe and dress herself, but admitted it

took her a long time to do so.  *Id.*  Rector indicated that she could perform light cooking or

cleaning, but required multiple breaks.  *Id.*  She was able to drive, but reported she currently did

not do so.  *Id.*

When examined, Rector moved her extremities well and had adequate peripheral pulses.

(R. 313).  Her cranial nerves were grossly intact, and she was alert and oriented.  *Id.*  No focal or

sensory deficits were appreciated.  *Id.*  Rector moved about the exam room easily but had a

decreased range of movement of her spine due to pain.  *Id.*  With regard to her lumbosacral

spine, Rector demonstrated 60/90 degrees of flexion, 20/25 degrees of extension, 20/25 degrees

of bending to the left and to the right.  (R. 316).  She ambulated with a stable gait at an

appropriate speed without use of assistive devices.  (R. 313).  Dr. Babb assessed Rector with

fibromyalgia, PTSD, and asthma.  *Id.*

Jeri Fritz, Ph.D., conducted a psychological evaluation of Rector, on March 3, 2010.  (R.

19-23).  Rector again complained of anxiety and explosive disorder and described her

kidnapping and sexual assault.  (R. 320).  Rector reported that she had participated in counseling

since she was twelve years old and had been depressed for many years.  (R. 321).  She described

experiencing illusions of movements, seeing shadowy figures, and recounted that she once tried

19

to push a shadowy figure of a man off her porch.  *Id.*  These visions had occurred since her

kidnapping.  *Id.*  Rector reported experiencing outbursts where she would yell, curse, or push

other people.  *Id.*  She stated that she had anxiety that would come and go depending on her

environment.  *Id.*  Following her kidnapping, Rector displayed a constant fear of men.  *Id.*  She

often woke up feeling anxious and had panic attacks where she felt hot, sick to her stomach, and

worried that she would vomit.  *Id.*  Rector also recalled her history of being sexually abused as a

child and raped at 24 years of age.  *Id.*  Rector reported that she had been receiving outpatient

therapy for eight months.  *Id.*

Rector cried throughout the appointment and appeared anxious and distressed.  (R. 322).

She was alert and displayed normal long-term memory but impaired short-term memory.  *Id.*

She demonstrated awareness of social norms and conventions, but Dr. Fritz noted she might have

some difficulty with common sense judgment.  *Id.*  Rector displayed the ability to understand,

retain, and follow directions.  (R. 323).  Her attention and concentration were within normal

limits, such that she would be able to perform simple, repetitive tasks.  *Id.*  However, Dr. Fritz

did note that Rector's anxiety might interfere with her cognitive processes.  *Id.*  Her ability to

relate to others, including co-workers and supervisors, was estimated to be poor due to her report

that she yelled, pushed or cursed with little provocation.  *Id.*  Rector's ability to handle the stress

of day-to-day interactions was judged to be poor.  *Id.*  She did appear capable of handling her

financial affairs in her best interest.  *Id.*  In conclusion, Dr. Fritz diagnosed Rector with PTSD

and Panic Disorder with Agoraphobia.  *Id.*

On March 23, 2010, non-examining agency consultant Janice B. Smith, Ph.D., completed

a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment.  (R.

324-41).  On the Psychiatric Review Technique form, for Listing 12.04, Dr. Smith indicated that

Rector had depressive syndrome characterized by thoughts of suicide and hallucinations,

delusions or paranoid thinking.  (R. 331).  For Listing 12.06, Dr. Smith indicated that Rector had

anxiety evidenced by recurrent and intrusive recollections of a traumatic experience.  (R. 333).

For the "Paragraph B Criteria,"[15] Dr. Smith stated that Rector had a moderate restriction of

activities of daily living, moderate difficulties in maintaining social functioning, and mild

difficulties in maintaining concentration, persistence, or pace.  (R. 338).  In the "Consultant's

Notes" portion of the form, Dr. Smith summarized Dr. Fritz's report.  (R. 340).

    In Dr. Smith's Mental Residual Functional Capacity Assessment, she found that Rector

was markedly limited in her ability to understand and remember detailed instructions.  (R. 324).

Rector was also found to be markedly limited in her ability to carry out detailed instructions.  *Id.*

Regarding social interaction, Rector was markedly limited in her ability to interact appropriately

with the general public.  (R. 325).  Rector was found to be able to perform simple tasks with

routine supervision, could adapt to a work situation, could relate to supervisors and peers on a

superficial work basis, but could not relate to the general public.  (R. 326).

    A Physical Residual Functional Capacity Assessment was completed by agency non-

examining consultant Kenneth Wainner, M.D., on April 19, 2010.  (R. 342-49).  Referring to

Rector's claimed fibromyalgia, Dr. Wainner pointed out that Rector's treating physician had not

---

[15] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment.  The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 1200.C.  *See also Carpenter v. Astrue,* 537 F.3d 1264, 1268-69 (10th Cir. 2008).

diagnosed her with fibromyalgia and there was no record to support that diagnosis.  (R. 343).

Dr. Wainner concluded that Rector could occasionally lift or carry 50 pounds and could

frequently lift or carry 25 pounds.  *Id.*  She could stand or walk for 6 hours in a work day and

could also sit for 6 hours.  *Id.*  Her ability to push or pull was unlimited.  *Id.*  No other limitations

were imposed.  (R. 344-49).

Dr. Smith's findings were confirmed as written by non-examining agency consultant

Sally Varghese, M.D., on June 24, 2010.  (R. 356).  Dr. Wainner's assessment was affirmed by

non-examining agency consultant Janet G. Rodgers, M.D., on July 19, 2010.  (R. 357).

### Procedural History

Rector filed her applications in October 2009.  (R. 130-40).  The applications were

denied initially and on reconsideration.  (R. 21).  An administrative hearing was held before ALJ

Charles Headrick on August 17, 2011. (R. 31-63).  By decision dated September 23, 2011, the

ALJ found that Rector was not disabled.  (R. 29).  On February 27, 2013, the Appeals Council

denied review.  (R. 1-5).  Thus, the decision of the ALJ represents the Commissioner's final

decision for purposes of this appeal.  20 C.F.R. §§ 404.981, 416.1481.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment."  42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act only if his

"physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[16]  *See also Wall v. Astrue,* 561 F.3d 1048, 1052-53 (10th Cir. 2009) (detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax,* 489 F.3d at 1084 (citation and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart,* 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Wall,* 561 F.3d at 1052 (quotations and citations omitted).  Although the court will not reweigh the evidence, the court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if

---

[16] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work.  20 C.F.R. § 404.1520.

the substantiality test has been met." *Id.*

## Decision of the Administrative Law Judge

In his decision, the ALJ found that Rector met insured status requirements through December 31, 2010.  (R. 24).  At Step One, the ALJ found that Rector had not engaged in substantial gainful activity since her alleged onset date of March 10, 2009.  *Id.*  At Step Two, the ALJ found that Rector had the following severe impairments: possible fibromyalgia, asthma, degenerative joint disease, degenerative disc disease, obesity, PTSD, and depression.  *Id.*  At Step Three, the ALJ found that Rector's impairments, or combination of impairments, did not meet any Listing.  *Id.*

The ALJ found that Rector had the RFC to perform medium work with the following non-exertional restrictions: Rector could perform simple tasks with routine supervision, could relate to supervisors and peers on a superficial basis, and could adapt to a work situation; however, Rector could not relate to the general public.  (R. 25).  At Step Four, the ALJ determined that Rector was unable to perform past relevant work.  (R. 27-28).  At Step Five, the ALJ found that there were a significant number of jobs in the national economy that Rector could perform, taking into account her age, education, work experience, and RFC.  (R. 28).  Therefore, the ALJ found that Rector was not disabled at any time from March 10, 2009 through the date of his decision.  (R. 29).

## Review

Rector asserts two arguments in her appeal.  First, she contends that the medical evidence does not support the ALJ's RFC determination.  Second, she argues that the ALJ failed to perform a proper credibility determination, which fatally flawed the RFC determination.

24

Because the ALJ's decision was supported by substantial evidence and complied with legal requirements, the undersigned therefore affirms.

**Medical Evidence and RFC Determination**

Rector first argues that the ALJ's RFC determination was not supported by the medical evidence.  Specifically, Rector contends that the ALJ disregarded evidence of low back pain with numbness and pain radiating into Rector's legs as well as mild-to-moderate degenerative joint disease in Rector's knees.  Plaintiff's Opening Brief, Dkt. #18, p. 2.  The ALJ determined that Rector had the RFC to perform medium work involving simple tasks with routine supervision, superficial interaction with supervisors and peers, and no interaction with the general public.  (R. 25).

The record does not support Rector's contention that the ALJ disregarded her low back pain with numbness and pain radiating into her legs and her mild-to-moderate joint disease in her knees.  At Step Two of his analysis, the ALJ specifically found that Rector's degenerative disc disease and degenerative joint disease were severe impairments.  (R. 24).  However, the mere presence of a condition, without any demonstrable work-related limitations, will not support a disability claim.  *Hinkle v. Apfel,* 132 F.3d 1349, 1352 (10th Cir. 1997) (*citing Bowen v. Yuckert*, 482 U.S. 137, 153 (1987)); *Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 1988) (a diagnosis does not "automatically mean" that a claimant is disabled).  Indeed, there was no opinion evidence[17] from any treating physician regarding functional limitations resulting from her low

---

[17] A "true medical opinion" is one that contains a doctor's judgment about the nature and severity of a claimant's physical limitations, information about what activities the claimant is capable of performing, or information regarding the claimant's specific limitations.  *Cowan v. Astrue,* 552 F.3d 1182, 1188-89 (10th Cir. 2008).

back and knee pain.  Based upon the medical and opinion evidence of record, the ALJ

determined that the highest level of work that Rector could perform was "medium."  (R. 25).

The RFC determination was supported by the ALJ's analysis of Rector's medical

evidence, including evidence pertaining to her knee and back problems.  (R. 24-27).  The ALJ

specifically discussed an August 2010 MRI of Rector's knees, which showed only mild bilateral

chondromalacia with mild right patella tilt, and which was otherwise normal.  (R. 24, 362-64).

The ALJ also referenced a February 2011 MRI of Rector's lumbar spine, which revealed

degenerative disc disease, but no significant disc protrusion or stenosis.  (R. 24).  The ALJ

further relied on Rector's December 27, 2008 physical examination, in which x-rays showed that

Rector's hands,  knees and the lumbar spine were completely normal.  (R. 26, 216-30).  The ALJ

also noted that x-rays of the cervical spine on December 31, 2009 were normal, that a physical

examination on February 27, 2010 was "essentially unremarkable," and that rheumatoid factor

testing on September 3, 201 was also normal.  (R. 26).

Additionally, the ALJ stated that his RFC findings were supported by the expert opinions

of several consulting physicians.  (R. 27).  When the medical opinions concerning a claimant's

RFC are basically consistent with the ALJ's specific findings concerning the claimant's RFC

determination, the ALJ's RFC decision is supported by substantial evidence.  *See Woods v.*

*Barnhart,* 121 Fed. Appx. 381, 384-85 (10th Cir. 2005).  Here, the ALJ noted that two agency

consulting physicians determined that Rector could perform simple tasks with routine

supervision, could relate to supervisors and peers on a superficial basis, and could adapt to a

work situation, but could not relate to the general public.  *Id.*  The ALJ also referenced the fact

that two other consulting physicians determined that Rector could perform medium work

26

activity.  *Id.*  Because the ALJ's RFC determination was consistent with the medical evidence

regarding Rector's RFC, the ALJ's RFC findings were supported by substantial evidence.

Rector complains that the ALJ "placed no limitations on [her] ability to stand, walk,

crawl, or kneel" and "fail[ed] to discuss the reasons for not establishing additional limitations."

Pl.'s Br., p. 3.  However, Rector puts forth no evidence that such limitations were imposed by

any treating or consulting physician.  In fact, non-examining agency consultant Dr. Wainner

opined that Rector could sit, stand, or walk for six hours in an eight-hour workday.  (R. 343).  As

the claimant, Rector had the burden to provide evidence of her functional limitations.  *Howard v.*

*Barnhart*, 379 F.3d 945, 948-49 (10th Cir. 2004).  Rector failed to put forth evidence to support

her contention that the ALJ should have imposed limitations on her ability to stand, walk, crawl,

or kneel.

In support of her argument that the ALJ disregarded evidence of her back and knee

problems, Rector also discusses the evidence in her medical records showing that she was treated

for neck and low back pain.  Pl.'s Brief, p. 3.  In his decision, the ALJ explicitly stated that he

"[did] not discount all of [Rector's] complaints."  (R. 27).  However, he did conclude that

Rector's treating physicians did not place any functional restrictions on Rector's activities that

would preclude medium work with the given restrictions.  *Id.*  The Tenth Circuit has held that

"disability requires more than mere inability to work without pain."  *Brown v. Bowen,* 801 F.2d

361, 362 (10th Cir. 1986).  "'To be disabling, pain must be so severe, by itself or in conjunction

with other impairments, as to preclude any substantial gainful employment.'"  *Id.* at 362-63

(*quoting Dumas v. Schweiker,* 712 F.2d 1545, 1552 (2d Cir. 1983)).  Rector's neck and back pain

alone did not preclude the ALJ from finding that Rector was not disabled, but rather was capable

of medium-level work.

Rector also argues that the ALJ "completely disregarded" the opinion of consulting examiner Jeri Fritz, Ph.D., who found that Rector's

> anxiety may interfere with her cognitive processes.  Her ability to relate to others, including co-workers and supervisors was estimated to be poor due to her report that she yells, pushes, or curses other[s] with little provocation.  Her ability to handle the stress of day to day interactions was judged to be poor.

(Pl.'s Br. P. 4, R. 323).  The Commissioner does not dispute that the ALJ erred by not expressly discussing Dr. Fritz's report and weighing her opinion.  Defendant's Response Brief, Dkt. #20, p. 7.  However, the Commissioner asserts that the error was not harmful because it did not have a potential impact on the disposition of the case.  *Id.*  The undersigned agrees.

Rector is correct in asserting that "[t]he ALJ must analyze *every* medical opinion."  Pl.'s Br., p. 4 (citing *Doyal v. Barnhart,*, 331 F.3d 758, 764 (10th Cir. 2003); *SSR* 96-5p).  However, in this instance, the ALJ did in fact refer to Dr. Fritz's report, noting that Dr. Fritz's "[p]sychological evaluation on March 3, 2010, was consistent with posttraumatic stress disorder and a panic disorder[.]" (R. 24).  Additionally, the ALJ expressly stated that he carefully considered the *entire* record in determining Rector's RFC and that he considered opinion evidence in accordance with the governing regulations.  (R. 25).  If an ALJ's decision states that he considered all of the evidence, a reviewing court does not assume otherwise.  *See Hamilton v. Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1498-99 (10th Cir. 1992).  The Tenth Circuit has stated that "[w]here . . . the ALJ indicates he has considered all the evidence our practice is to take the ALJ 'at [his] word.'" *Wall*, 561 F.3d at 1070 (*quoting Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007)).  The ALJ was not required to engage in a more detailed discussion

of Dr. Fritz's report in order to fulfill his duty to analyze every medical opinion in the case. Further, the ALJ's duty to expressly weigh medical evidence is weakened when none of the record evidence conflicts with the ALJ's findings.  *See Howard*, 379 F.3d at 947.  In this instance, Dr. Fritz's medical opinion that Rector had anxiety, a poor ability to relate to others, and a poor ability to handle stress of day to day interactions was consistent with the ALJ's Step Two determination that Rector's PTSD and depression were severe impairments and the ALJ's finding that Rector could only perform simple tasks with routine supervision, could relate to supervisors and peers only on a superficial basis, and could not relate to the general public at all. (R. 25, 323).

Additionally, Dr. Fritz noted that her "estimate" that Rector had a poor ability to relate to co-workers and supervisors was based solely on Rector's assertion that she yelled, pushed, or cursed others with little provocation, rather than on Dr. Fritz's objective findings or diagnosis. (R. 323).  An ALJ is entitled to reject the conclusions of a physician that are not supported by specific findings.  *See Castellano v. Sec'y of Health & Human Servs.,* 26 F.3d 1027, 1029 (10th Cir. 1994).  Therefore, the ALJ acted within his power by not assigning more prominence to Dr. Fritz's opinion that Rector had a poor ability to relate to others, since this finding was based solely on Rector's statements and not Dr. Fritz's objective findings.  Yet, by restricting Rector to performing simple tasks and no interaction with the general public, the ALJ still accounted for the issues raised by Dr. Fritz.

The record demonstrates that the ALJ properly considered all of the evidence when making his RFC determination.

**Credibility**

29

Rector next argues that the ALJ failed to perform a proper credibility determination, which fatally flawed the ALJ's RFC findings. Regarding this issue, the undersigned finds that the ALJ's decision was supported by substantial evidence and complied with legal requirements. Therefore, the ALJ's decision is affirmed.

Once a medically determinable impairment is established that could reasonably be expected to produce symptoms complained of, the ALJ is required to evaluate the intensity, persistence, and functionally limiting effects of the symptoms. 20 C.F.R. §§ 404.1529(c), 404.929(c). In order to do this, the ALJ must assess the credibility of the claimant's statements regarding the symptoms and their functional effects. *SSR* 96-7p, 1996 WL 374186, at *1. Credibility determinations by the trier of fact are given great deference. *Hamilton,* 961 F.2d 1499.

> The ALJ enjoys an institutional advantage in making [credibility determinations].
> Not only does an ALJ see far more social security cases than do appellate judges,
> [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities
> of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2002). In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir. 1995); *SSR* 96-7p, 1996 WL 374186. "[C]ommon sense, not technical perfection, is [the] guide" of a reviewing court. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1167 (10th Cir. 2012). Some of the factors an ALJ may consider in assessing the credibility of a claimant's complaints include "the levels of medication and their effectiveness, the extensiveness of the attempts . . . to obtain relief, the frequency of medical contacts, the nature of the daily activities, subjective measures of credibility that are peculiarly within the judgment of

the ALJ,

. . . and the consistency of compatibility of nonmedical testimony with objective evidence."

*Kepler*, 68 F.3d at 391 (quotation and citation omitted).

> Rector complains that the ALJ simply made a "boilerplate finding" that Rector's
>
> medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(R. 26).  It is true that boilerplate language is disfavored because it fails to inform the reviewing court "in a meaningful, reviewable way of the specific evidence the ALJ considered."  *Hardman v. Barnhart,* 362 F.3d 676, 679 (10th Cir. 2004).  However, boilerplate language is "problematic only when it appears 'in the absence of a more thorough analysis.'"  *Keyes-Zachary*, 695 F.3d at 1170 (quoting *Hardman*).  Here, Rector's argument fails because she fails to take into account the "more thorough analysis" that the ALJ provided.

A reviewer has no difficulty finding the ALJ's reasons for finding that Rector was less than fully credible.  For instance, despite Rector's contention that her activities of daily living were "extremely limited," the ALJ found that they were only moderately restricted.  (R. 25).  The ALJ noted that while Rector's daily activities appeared to be restricted, those restrictions were self-imposed.  (R. 27).  The ALJ emphasized that Rector's treating physicians did not impose any functional restrictions on her activities that would preclude medium work with the given restrictions.  *Id.*  The ALJ went so far as to say that "there [was] no evidence that any of [Rector's] treating physicians [had] told her to do nothing all day."  *Id.*  The Tenth Circuit has affirmed decisions in which the credibility was based in part on the fact that no treating

31

physician had placed restrictions on the claimant.  *See, e.g., Boswell v. Astrue,* 450 Fed. Appx. 776, 778 (10th Cir. 2011) (unpublished); *Stokes v. Astrue,* 274 Fed. Appx. 675, 686 (10th Cir. 2008) (unpublished).

The ALJ also gave "great weight" to the findings of state agency physicians and psychologists, which supported the ALJ's decision that Rector could perform medium work.  (R. 27, 324-27, 356, 342-49, 357).  *Cowan*, 552 F.3d at 1189-90 (opinion evidence of nonexamining consultants can constitute substantial evidence); *Flaherty*, 515 F.3d 1071 (ALJ entitled to consider nonexamining physician's opinion); *Weaver v. Astrue*, 353 Fed. Appx. 151, 154-55 (10th Cir. 2009) (unpublished) (nonexamining opinion was substantial evidence supporting RFC determination).

Regarding Rector's mental health issues, the ALJ noted that Rector received mental health treatment from April 2007 to November 2009, but that there was no evidence that Rector was seen after that date.  (R. 27).  Rector testified that she was not receiving mental health treatment.  *Id.*  The ALJ opined that this "negatively impact[ed] [Rector's] credibility regarding the severity of her anxiety and panic attacks."  *Id.*  The ALJ further asserted that "[i]f these symptoms were as severe and disabling as alleged, it is reasonable to assume that [Rector] would exhaust every means possible to obtain relief of those symptoms."  *Id.*  The extent of the claimant's efforts to obtain relief is a legitimate specific reason for a finding of credibility. *Kepler*, 68 F.3d at 391; *Hagar v. Barnhart*, 102 Fed. Appx. 146, 148 (10th Cir. 2004) (unpublished) (ALJ was entitled to consider that, if the claimant's symptoms were as debilitating as asserted, she would have sought additional treatment).  All of these were legitimate and specific reasons for finding Rector less than fully credible, and these reasons were closely linked

to substantial evidence.

Rector also argues that the ALJ erred by failing to assess the credibility of a Third Party Function Report (R. 166-73) completed by Debra Crabtree, Rector's mother.  This credibility determination is also entitled to deference when supported by substantial evidence.  *See Adams v. Chater*, 93 F.3d 712, 715 (10th Cir. 1996).  The Tenth Circuit does not require the ALJ to make a specific credibility determination of every witness, including a claimant's family member.  *Id.*  ("We decline claimant's invitation to adopt a rule requiring an ALJ to make specific written findings of each witness's credibility, particularly where the written decision reflects that the ALJ considered the testimony.").  Ms. Crabtree's report contained virtually the same information as Rector's own testimony.  The ALJ rejected this information when he found that Rector's statements were not wholly credible.  Because the ALJ discussed this information, the court finds no error in the ALJ's failure to discuss Ms. Crabtree's report.  It was proper for the ALJ to consider the familial relationship and the lack of corroborating evidence as factors in assessing or failing to assess the credibility and value of Ms. Crabtree's statements.  *Kepler*, 68 F.3d at 391 (Relevant factors include "the motivation and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.") (quotation omitted).

Furthermore, the ALJ asserted that he carefully considered all the evidence.  (R. 25).  When an ALJ says that he has considered all the evidence, the Tenth Circuit has stated that it will take the ALJ at his word.  *Wall*, 561 F. 3d at 1070.

In conclusion, the ALJ made a credibility assessment that was supported by substantial evidence and that complied with legal requirements.  Rector's arguments to the contrary are not

persuasive.  "[T]he ALJ closely and affirmatively linked his adverse credibility finding to substantial evidence in the record and did not employ an incorrect legal standard.  'Our precedents do not require more, and our limited scope of review precludes us from reweighing the evidence or substituting our judgment for that of the agency.'" *Zaricor-Ritchie v. Astrue*, 452 Fed. Appx. 817, 824 (10th Cir. 2011) (*citing Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009) (further quotations omitted)).

Based on the foregoing, the undersigned recommends that the decision of the Commissioner denying disability benefits to Claimant be **AFFIRMED.**

## Objections

In accordance with 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b), a party may file specific written objections to this Report and Recommendation, but must do so by April 11, 2014.  If specific written objections are timely filed, the District Judge assigned to this case will make a *de novo* determination in accordance with Rule 72(b).  A party waives District Court review and appellate review by failing to file objections that are timely and sufficiently specific (the "firm waiver rule").  *Moore v. Astrue*, 491 Fed. Appx. 921, 923 (10th Cir. 2012) (unpublished), *citing In re Key Energy Res., Inc.,* 230 F. 3d 1197, 1200-01 (10th Cir. 2000).

Dated this 21st day of March 2014.

Paul J. Cleary
United States Magistrate Judge